NOT DESIGNATED FOR PUBLICATION

No. 121,968

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANIEL OSVALDO CASTANEDA,
*Appellant*.

MEMORANDUM OPINION

Appeal from Meade District Court; E. LEIGH HOOD, judge. Opinion filed December 23, 2020. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., BRUNS and SCHROEDER, JJ.

PER CURIAM: This direct criminal appeal centers on whether a police deputy had a reasonable suspicion to extend a traffic stop and call for a drug dog to examine a stopped car. We hold that he did and affirm the conviction.

After losing a motion to suppress the marijuana found in the car, Daniel Castaneda and the State submitted to the court agreed stipulations of fact. The trial court found Castaneda guilty of having 90 pounds of marijuana in that stopped car. The court then

1

imposed a downward durational departure sentence of 66 months based on the joint recommendation of the parties.

In July 2018, a Meade County Sheriff's deputy searched Castaneda's SUV during a traffic stop and discovered a large amount of marijuana. There is no video of the car stop, but the facts are undisputed. The parties stipulated to the facts. The stipulations began with a general description of the location, the vehicle, and the initial circumstances of the car stop:

"1. Approximately 3:00 pm on July 28, 2018, Deputy Ritter with the Meade County Sheriff's Department stopped a blue GMC Yukon with Arizona plates for changing lane without signaling on US-64 at mile marker 43. The location described is within the City of Meade, Meade County, Kansas.

"2. Upon the Deputies initial approach, he noticed two large cardboard boxes in the rear cargo area of the Yukon and that the vehicle. The Deputy also noticed two juveniles in the middle row of passenger seats and a female driver and male passenger, later identified as Daniel O. Castaneda, the Defendant. The Deputy asked for identification, insurance, and registration. While the Defendant was looking insurance and registration, the Deputy asked where they were heading. The Defendant stated, 'Lexington.' The Deputy asked to which Lexington they were heading. The Defendant took a few seconds to respond. The Deputy asked if it was in Missouri, Illinois, or Kentucky. The Defendant, after another pause, said 'Kentucky.'

"3. Upon retrieval of the insurance and registration, the Deputy relayed the information into dispatch to perform a driver's license check. The Deputy learned the travel plans from Phoenix, Arizona to Lexington, Kentucky and while waiting on dispatch, the Deputy searched the travel plans on Google Maps and noted that the route through Meade, Kansas added two hours of estimated drive time."

After that, the parties offered the court more details of the deputy's observations and suspicions:

2

"4.  Upon clearing the driver's license check, the Deputy re-approached the Yukon and returned the information back to the driver and gave a warning. After taking several steps and breaking contact with the Yukon, the Deputy re-engaged the Defendant. The Deputy learned that Defendant and his family were heading to Kentucky for a week to celebrate his son's birthday. The Deputy did not see a great deal of luggage and only noticed a medium sized suitcase and back pack.

"5.  The Deputy asked the Defendant if he had any marijuana in the vehicle and the Defendant gave a nervous response of 'no, no, no' while waving both hands. He responded with a simple 'no' without body movement to other similar questions.

"6.  The Deputy asked several questions. The Deputy asked to search the vehicle and the Defendant stated 'no, you may not.' The Deputy interpreted the response, to the marijuana question as nervous. Deputy Hornback responded to the scene about 20 minutes after called. The vehicle, not its occupants, were free to leave while waiting on Deputy Hornback."

The parties then described for the court what happened when the drug dog arrived at the scene:

"7.  Deputy Hornback asked to have everyone exit the vehicle. Upon deployment of the K-9 officer, the K-9 alerted. Deputy Ritter searched the vehicle by beginning in the trunk. The Deputy opened one of the cardboard boxes located in the trunk and could smell the odor of raw marijuana. Deputy Hornback commented that he could smell the marijuana also.

"8.  Inside the cardboard box was a speaker system. Deputy Ritter could see vacuum sealed packages inside the speaker box. In total, forty-six (46) packages were removed from the speaker boxes. Each vacuum sealed package contained a green leafy vegetation that field tested positive for marijuana. The total weight of the forty-six (46) packages was 92.115 pounds, or 41.80 kilograms.

"9.  The Deputy later interviewed the Defendant and the Defendant stated that he had placed the vacuum sealed packages of marijuana in the speaker boxes. He said that he was on his way to Lexington, Kentucky but that he did not have any friends or family there. The Defendant further stated that his girlfriend, the driver of the vehicle, did not have any knowledge of the marijuana in the vehicle."

3

The State charged Castaneda with one count of unlawful cultivation or distribution of a controlled substance, one count of a tax stamp violation, and one misdemeanor count of child endangerment.

In Castaneda's pretrial motion to suppress the marijuana found in his SUV, he argued that the deputy had impermissibly detained him while waiting for the drug dog to arrive.

In response, the State called the deputy to testify. He testified that he had a reasonable suspicion to detain the occupants of the SUV and wait for the drug dog because:

- Castaneda could not quickly recall what state he was traveling to;
- the deputy could only see one suitcase and one backpack, which seemed inadequate for a family of four for a week-long trip;
- Castaneda had a tattoo on his hand that is sometimes associated with gang membership;
- Castaneda was physically animated and nervous when the deputy had asked whether there was marijuana in the car, but had calmly answered "no" when asked about other drugs;
- Castaneda had been nervous and overexplained by showing his pocketknife when asked if there were illegal weapons in the car;
- Castaneda was taking a route from Arizona to Kentucky that added two hours to the trip; and
- Castaneda and his girlfriend were travelling from Phoenix—a known "source spot" of narcotics trafficking.

4

After hearing this, the court found that the deputy had reasonable suspicion to detain Castaneda while waiting for the drug dog to arrive and denied the motion to suppress. In its analysis, the court cited three factors:

(1)   Castaneda told the deputy that he was heading to Lexington but could not immediately recall which state that was in;

(2)   Castaneda's nervous response when asked about marijuana; and

(3)   Castaneda was out-of-route for his trip.

The record discloses that the court explicitly rejected the deputy's testimony about Castaneda's tattoo because it found that the deputy did not have any related training or experience concerning such identifiers.

Castaneda makes a twofold attack on his conviction. He contends there is insufficient evidence in the record to prove an intent to distribute the marijuana, an element of the crime that the State had to prove. And, secondly, he alleges the court erred when it denied his motion to suppress the evidence. We address the issues in that order.

*There is sufficient evidence in the record to support a finding of guilt.*

In this argument, Castaneda focuses on the judge finding him guilty of "distribution" of marijuana. Castaneda contends that, based on the stipulated facts, there is no evidence that he ever sold, offered to sell, transferred, or tried to transfer the marijuana. As a result, Castaneda argues, insufficient evidence supports his conviction for *distribution* of marijuana. But Castaneda's argument omits some important context.

The State charged Castaneda with violating K.S.A. 2019 Supp. 21-5705(a)(4), which makes it a crime "to distribute or possess with the intent to distribute" marijuana. At Castaneda's preliminary hearing, the State said that it was proceeding with a charge of possession with intent to distribute based on its second amended complaint. Then at the

5

trial on stipulated facts, when the court asked what the charge was, the prosecutor and Castaneda's attorney both said that it was possession with intent to distribute under the second amended complaint.

Castaneda's attorney then found a copy of the complaint, gave it to the judge, and stated that it was for "[u]nlawful cultivation or distribution of a controlled substance," which is K.S.A. 2019 Supp. 21-5705. And the trial court wrote in its journal entry of the trial that it found Castaneda guilty beyond a reasonable doubt of violating K.S.A. 2019 Supp. 21-5705(a)(4), which, again, makes it a crime to distribute marijuana *or* possess marijuana with the intent to distribute it.

The record is clear that the trial court found Castaneda guilty of possession with intent to distribute, and sufficient evidence supports that conviction. Sufficient evidence supports a conviction on appeal when, with the evidence viewed in a light most favorable to the prosecution, the appellate court is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Williams*, 299 Kan. 509, Syl. ¶ 1, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 807, 375 P.3d 332 (2016). Here, a rational fact-finder could easily find beyond a reasonable doubt that Castaneda possessed the marijuana with the intent to distribute it—the marijuana was being transported cross-country, it had been divided into 46 vacuum sealed packages, and the amount far exceeded what could be considered an amount for personal use.

There is no reversible error here.

*The deputy had a reasonable suspicion to wait for the drug dog.*

Castaneda's main attack concerns the deputy prolonging the car stop. He does not contest the basis for the traffic stop. Nor does he say that the deputy lacked probable

6

cause to search the SUV once the drug dog alerted. Instead, he argues that the deputy improperly detained him after he did not consent to a search and the initial traffic stop was completed.

The law is clear. Traffic stops are seizures under the Fourth Amendment to the United States Constitution and are subject to its limitations. *State v. Lowery*, 308 Kan. 359, 363, 420 P.3d 456 (2018). In our view, this was an investigatory detention. To lawfully conduct an investigatory detention under the Fourth Amendment, police officers must have reasonable suspicion—an objective and specific basis for suspecting that the person being detained is involved in criminal activity. 308 Kan. at 366. We also note that K.S.A. 22-2402(1) allows a law enforcement officer to stop a person in a public place when the officer reasonably suspects the person "is committing, has committed or is about to commit a crime."

Of course, what is reasonable depends on all of the circumstances as viewed from the perspective of a trained police officer. But officers must have specific and articulable facts to support their suspicion for it to be reasonable. *Lowery*, 308 Kan. at 366.

When the defense moves to suppress evidence arising from a police stop, the State must show the court that the stop was lawful. On appeal, we will accept the factual findings of the district court when substantial evidence supports them. We will not reweigh the evidence nor assess the credibility of witnesses. But we review the legal conclusions drawn from those facts independently, without deferring to the district court's decision. *Lowery*, 308 Kan. at 364. Whether reasonable suspicion exists is a question of law. *State v. Sharp*, 305 Kan 1076, 1081, 390 P.3d 542 (2017).

The State argues that five factors support the trial court's reasonable suspicion finding:

(1)     Castaneda's delayed response when asked to which Lexington he was traveling;

 (2)    Castaneda's use of a route from Phoenix to Lexington that added two hours to the trip;

(3)    the deputy saw only one small suitcase and a backpack in the back of the SUV;

(4)    Castaneda's nervousness when asked whether there was marijuana in the car; and

(5)    Castaneda's nervous "over-explaining" when denying that there were illegal weapons in the vehicle.

We note that the deputy also testified about Phoenix being a known "source spot" for drug trafficking, but the State has not mentioned that factor on appeal. Thus, we consider that point abandoned. See *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018).

*Destination and route traveled*

The record reveals that while Castaneda was looking for his insurance and registration, the deputy asked where he was heading. Castaneda told him Lexington. The deputy then asked which Lexington. Castaneda was silent for "a few seconds," then the deputy prompted him with "Missouri, Illinois, or Kentucky?" Castaneda responded with Kentucky.

The record also reveals that the fact stipulations of the parties admitted that the deputy's Google map search suggested the route from Phoenix, Arizona to Lexington, Kentucky was two hours longer by going through Meade, Kansas. The deputy said this made him suspicious.

8

Discrepancies in travel plans or histories have been used as objective reasonable suspicion factors in other cases, depending on the nature of the discrepancy. See *State v. Schooler*, 308 Kan. 333, 354, 419 P.3d 1164 (2018). In *Schooler*, our Supreme Court approvingly cited the Tenth Circuit's approach to the issue, which distinguishes between "merely unusual travel plans, which do not contribute to reasonable suspicion, and 'bizarre, inconsistent and evasive' ones, which do." 308 Kan. at 354. Inconsistent and evasive answers to questions contribute to reasonable suspicion because "lies, evasions or inconsistencies about *any* subject while being detained may contribute to reasonable suspicion." (Emphasis added.) 308 Kan. at 354 (quoting *United States v. Simpson*, 609 F.3d 1140, 1149 [10th Cir. 2010]).

The deputy, based on Castaneda's responses, suspected that he may be lying to him. On appeal, we only have the words from a transcript to weigh and did not hear the words as they were spoken, nor did we see Castaneda's demeanor when he was speaking them. The trial court held there was certainly reasonable suspicion here. We recognize along with the trial court that these concerns about Castaneda's responses contributed to the deputy's suspicion.

*Castaneda's nervousness*

Two of the factors the State uses for support involve Castaneda's nervousness. We note the contrast. The deputy testified that Castaneda calmly responded to questions about methamphetamine and cocaine, but he acted nervous when asked about marijuana. The deputy said that Castaneda became physically animated and had a smirk or slight grin:

> "[H]e became very physically animated with his hands and arms, waving them side-to-side. He shook his head no, and he—his facial expression was almost, like, a smirk or a

9

slight grin where one side of his face was kinda cracking a smile, but it wasn't a full smile."

The deputy then testified that when he asked if there were illegal weapons in the car, Castaneda responded that all he had was a pocketknife. He then pulled it out of the glovebox and showed it to the deputy. The deputy perceived that as a nervous over-explanation because he had asked about illegal weapons, not legal weapons.

Again, on appeal, we will not usurp the trial court's role and decide about the degree of nervousness Castaneda presented to the deputy. We defer to the lower court that saw and heard the deputy testify at the suppression hearing. The judge ruled that this factor contributed to the deputy's reasonable suspicion.

*Lack of luggage*

The deputy testified that he saw a medium-sized suitcase and a backpack. In his view, that was not enough luggage for a week-long trip for a family of four. He also said there could have been more luggage under the two boxes in the trunk, but he did not know about that while he was conducting the stop.

Amounts of luggage that are inconsistent for the claimed duration of a trip can support the formation of a reasonable suspicion. Several federal cases illustrate this point. In *United States v. Wisniewski*, 358 F. Supp. 2d 1074, 1092 (D. Utah 2005), *aff'd* 192 Fed. Appx. 749 (10th Cir. 2006) (unpublished opinion), the court pointed out that very little luggage in the automobile compared to the stated purpose of the trip contributed to a reasonable suspicion. In *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995), the lack of luggage for an alleged two-week trip was a factor supporting a reasonable suspicion finding. Then, in *United States v. Pulido-Vasquez*, 311 Fed. Appx. 140, 145 (10th Cir. 2009) (unpublished opinion), the court held that a lack of luggage, even though

two men claimed to be taking an overnight trip, was a factor that suggested illegal activity. And finally, in *United States v. Correa*, 641 F.3d 961, 964 (8th Cir. 2011), the presence of just a small gym bag, which the officer considered too small for the trip described, contributed to a reasonable suspicion.

Lies, evasions, or inconsistencies about *any* subject—including a lack of luggage—while being detained may contribute to a reasonable suspicion. See *Schooler*, 308 Kan. at 354. Here, Castaneda's lack of luggage supports the trial court's ruling.

To sum up, we do not feel compelled to reverse. Considering all of the circumstances here, the deputy did have specific and articulable facts suggesting that Castaneda had committed, was committing, or planned to commit a crime. Castaneda did not know where he was going until prompted by the deputy. He appeared nervous when answering questions, and he became physically animated during one of those answers. The deputy did not think the amount of luggage he could see was adequate, which supports reasonable suspicion.

We affirm Castaneda's conviction.